Thank you very much, Judge Hurwitz, and may it please the Court. With the Court's permission, I'd like to reserve five minutes of time for rebuttal. As initial matter, Your Honors, the preliminary injunction should be vacated because the plaintiff's organizations have not alleged that they have suffered any cognizable injury in fact as a result of the challenged zoning permits. Plaintiffs can vote the Haven Realty's Diversion of Resources Theory of Standing, but the Court's cases require plaintiffs to demonstrate both a diversion of resources and a frustration of the organization's mission. Counsel, I don't quite understand that jurisdictional argument. Your side is the one that were moved into federal court, and so if they don't have standing in federal court, doesn't it just go back to state court and you're back where you started? That's not correct, Judge Blumenthal, and the reason for that is that the case law is well settled that remand is not appropriate, whereas here the case was properly removed pursuant to Section 1442A.1, and standing is assessed based on the party who is invoking the federal court, which in this case was Geo. Geo showed that it met all three requirements for jurisdiction under Section 1442A, and I would refer the Court to a couple of cases on this point. This Court's case in Benson is closely on point, albeit not squarely on point. In that case, the IRS removed the suit brought to state court pursuant to Section 1442A, but the Court held that the federal court lacked subject matter jurisdiction over the IRS. Like the plaintiffs here, the plaintiff taxpayer in that case argued that Section 1447C required a remand to state court, but this Court held that... That's quite different, Mr. Kirk. Mr. Kirk, that's quite different because the state court couldn't have had jurisdiction over the defendant in that case, which was the IRS. And haven't we said that whether or not Article III standing is there is an open issue in federal officer removal cases? What you said, Your Honor, is that the Supreme Court has said it... Has left that open. Has left that open. And is the upshot of your position that you can remove a case in which the parties have an actual controversy in state court? The federal court must dismiss it because the plaintiff in state court didn't have Article III standing in federal court, and the case cannot proceed anywhere? You can keep removing it every time they file it? That is precisely my position, Your Honor. Why don't you move on to your next argument, then? Your Honor, if I could direct you to one other authority before I do. Justice Breyer's opinion when he was on the Court of Appeals for the First Circuit directly addressed this. And what he said is that after a defendant is properly removed pursuant to Section 1442A, if it is determined that plaintiff lacks standing, the proper remedy is dismissal, not remand to state court. With that, Your Honor, I will move on with the Court's permission. If the Court reaches the merits of the District Court's preliminary injunction ruling, it must be reversed because SB 29 discriminates unconstitutionally against federal contractors carrying out federal operations in exactly the same way as the provision that this Court struck down in United States v. California. It is undisputed that SB 29 applies only to contractors operating federal immigration detention facilities, and neither plaintiffs nor the District Court have identified any other provision of California law that imposes analogous burdens on state detention facilities. Mr. Kirk, let me ask you a question at this point. I don't know how you and the city have divided argument, but we operate under a general principle of avoiding constitutional questions if possible. And the thing that most interests me in this case, at least at the outset, is whether or not the state statute was violated at all. And I don't know whether or not that's your responsibility or the United States' responsibility. The city says it doesn't really want to argue unless we have questions. So can you address that question for me? I certainly can, Your Honor. And just to be clear, we believe that there's not just one but three ways we can resolve this case without getting to the Constitution. And I kind of suspected that the government might make the constitutional argument. So I'm trying to figure out the statutory argument. Will you help me with that? Yes, Your Honor. There were three different requirements of SB 29 that were challenged by the plaintiffs. The two-meeting requirement, which we would respectfully submit, was satisfied because the city of McFarland held not two but three separate meetings. The argument that the plaintiffs make in response to that and that the district court adopted is based on the statutory phrase public agency. It says it applies to a city, a county, a city and county, or a public agency. But we respectfully submit that the subordinate bodies of the city cannot be public agencies under this statute because cities can only act through their subordinate bodies. And so if you're going to say that any body of a city is itself an agency, there's no work left in the statute to be done by the word city. The second requirement that was challenged was the 180-day notice requirement. And in that, Your Honor, it is undisputed that the initial notice to the public of the proposed permit modifications was provided on January 10, and it is likewise undisputed that the resolutions approving the modifications expressly provided that they shall not be considered executed, issued, or effective until July 15, 2020. That's more than 180 days. More than 180 days from submission? The 180 days is from January 10 when it was first noticed to the public. Right, right. So the question that I have is, is there any case law that helps us understand what the word execution in the second provision of the statute means? Your Honor, there's not that I'm aware of. The word execution, we noted the black law definition of it, which is to make effective, to carry into execution. And we think that that's got to be, in effect, it's the same as it being issued and effective. And it's very clear from the resolution, the two resolutions approving our CUP modifications, that it would not be issued and effective until July 15. And that more than satisfies the SB 29. The argument to the contrary, Your Honor, equates approval by the city council of the CUP modifications with execution. And those are two different things. The city of McFarland's own ordinances describing the process clearly distinguish between approval, on the one hand, and issuance, which I would submit to you. Could you tell me, could the city, had it been inclined to do so, could the city have made any changes between when it decided to approve and when it executed? It had complete carte blanche to rescind what it had done, to change what it had done, to do anything it wanted between April 23rd when it was approved and July 15th when it was issued and took effect. Now, if it tried to revoke it after it was issued, the McFarland City Code provides that it has to provide the same process that went into approving it in the first place. So there would have been limitations after July 15th, Judge Kleinfeld, but before July 15th, it had complete power to do whatever it wanted. So what you're saying is that the approval was basically tentative approval? It was entirely tentative approval that could have been revoked. Any member of the public that wished it to be revoked had every right to petition, to lobby, to do whatever one does to try to convince the legislative body to not go forward with an action that it has approved. Can I ask the flip side of your city argument? So what does public agency do if the city planning is not a public agency? Your Honor, we think it covers things like special districts, water districts, irrigation districts, entities like that that have permitting authority. Is there a basis for that? Well, those are public agencies and they're independent of the cities, the city and county, and the county. Our basic point is that public agency can't refer to subunits or the first three nouns in the series because all of those entities, cities, counties, and city and counties, necessarily have to act through their subentities. There's no other way for them to act. And so if you read public agency to include them, it reads it out of the statute. Is there anything in California law that supports your theory that public agency means water districts and other things of that nature? I'm not aware of anything specifically, Your Honor, and I'm not limiting it to them. I'm just giving them an example. There is California law to the extent that those districts are public agencies. Correct. Correct. What your argument seems to be is that each of these four categories are exclusive. They're the permitting authority. They refer to the permitting authority. A city and county is like San Francisco. A city is like all other cities, et cetera, et cetera. And they're all meant to be separate things, not subdivisions of each other. That's exactly right, Your Honor. And then I did briefly want to emphasize a separate basis for reversal is that the plaintiffs did not prove and the district court did not find that the plaintiffs themselves suffered any irreparable injury. The district court focused entirely on the alleged injury to detainees and the McFarland public. And plaintiffs don't even attempt to defend that ruling. They instead try to re-invoke the same diversion of resources injuries that they cite for their standing. But that's insufficient, Your Honor, because this court has squarely held in the National Wildlife Federation case, and I'm quoting 886 F3rd and 818, that irreparable harm should be determined by reference to the purpose of the statute being enforced. Yet the supposed diversion of resources that the plaintiffs allege here had nothing whatsoever to do with the purposes of SB 29. So that's an independent basis for reversal in addition to our compliance with SB 29. Mr. Kirk, you wanted the same subtype for rebuttal. You don't have to, but I wanted to remind you. Well, thank you, Judge Horwitz, and I'll take you up on that. And if the court has no further questions, I'll subside until rebuttal. Mr. Tenney. May it please the Court, Daniel Tenney for the United States. The state enactment at issue here applies specifically to civil immigration detention facilities. So on its face, it singles out the federal government, which is the only entity that operates such facilities. And it places a burden on the federal government by acting through the entities with which it deals, namely federal contractors. And it makes it more difficult for the federal government to run detention facilities or to get permits to allow it to run detention facilities than similarly situated entities that would run private contractors that would run state detention facilities. And so under well-established intergovernmental immunity principles, most recently invoked by this court in the United States versus California case, which is in many ways quite similar. This is an impermissible discrimination against the federal government and thus cannot be allowed to. Mr. Tenney, one question, and I couldn't tell this from this record, is let me pose a hypothetical for you and then you can tell me whether or not it's true. In fact, what if the state of California had two separate statutes identical in form? One which said, if you want to run a detention facility for state detainees, here's what you must do. And had another statute that said, if you want to run a detention facility for federal detainees, here's what you must do. Immigrant immigration detainees. And they were exactly the same. Would the state statute then be unconstitutional? I mean, assuming that those are the only two relevant categories, which I take your hypothetical to assume, no. The point is that in this case, is there any evidence about what the requirements were for expanding or the the size of state facilities? Well, are they subject to local zoning decisions or not? They may be subject to local zoning decisions. But what SB 29 says is that on top of whatever requirements locality may wish to impose for immigration facilities and immigration facilities only, there are these additional requirements. And so to take an example from the record, GEO said in the past, before SB 29 was in effect, when it would have been subject to the same scheme as state detention facilities, on average, it took them about 90 days to get their approvals. And then now there's a state law that says they can't get it in less than 180 days. Now, nobody's pointed to any provision of state law that would suggest that a state detention, a private contractor running a state detention facility would have to wait 180 days to get their approval. Could you address whatever you wish to address regarding standing of the party that obtained the TRO and injunction? We're not actually addressing standing. Our brief is limited to intergovernmental immunity. The closest we've come is we did talk about the balance of harms, which is something of significant interest to the federal government. OK, but you don't want this case dismissed on standing. You want us to go to the merits. No, we just haven't taken a position on standing. We refer you to the party's briefing on standing. And you can decide, you know, if you dismiss it on standing, then the issues on which we participated drop out. OK, you know, the federal interest here is in in the constitutionally and in getting to operate this facility. I understand. I understand. Thanks. I have one question. You're not arguing that the directly regulates prong of the intergovernmental community. You only are you're only arguing the discrimination against. Right. Right. We haven't we haven't. I mean, the parties have argued direct regulation, too. We haven't weighed in on that. Our position is that it should be invalidated. Assuming the court reaches the question on the discrimination part because it does. So I guess I gets back to my question. Is the relevant thing facial discrimination or actual discrimination? In other words, does the record let us know whether or not a detention facility that is not contracting with the federal government is subjected to similar procedural requirements? These are not substantive requirements. They're all procedural. Do we know that? Can we tell that from the record? Well, I mean, they're they're they're not they're procedural in the sense that they relate to how you get your permit. I mean, I don't I don't know that I would agree that they're not substantive in the sense that if you wanted a permit to open a facility in 30 days because you had an urgent need to do so. It's it's literally illegal and impossible to get that if you're the federal government and it's legal, impossible to get it if you're running a state detention facility. So I don't know that they can be dismissed as procedural in the sense. No, I didn't mean to dismiss them as such. I just meant that there were different substantive requirements being applied. It was just a different process to go through. And so I'm trying to figure out whether or not state facilities that don't deal with federal immigration are put through similar processes or whether these are roughly equivalent ones or whether the record helps me on that at all. I mean, I'm not sure that's a question of the record. There is there is a state law that SB 29 that applies only to federal facilities. There's no state law that anybody has pointed to that imposes the same or similar requirements on state facilities. That's my question. Thank you. If if there were such a law, I would expect the plaintiffs and certainly the state of California, which has intervened to defend its statute, to point to it and say, actually, this is this is just our way of making sure that the federal government is swept into our otherwise applicable scheme. But nobody has made an argument like that because it's just not true. What's actually going on is that they wanted to have a separate scheme just for the federal government. That makes it harder. Do you need any do you need any of the argument that you're making now? Or did you already finish it when you said this statute just applies to the federal government and nobody's pointed to anything analogous that applies to anyone else? Aren't you all done at that point? I noticed you're going on and I'm thinking, oh, but what about this? What about that? Maybe I have quibbles with some of the other things you're saying. I don't know. Were you all done at that point or is it necessary also to win on what you're arguing now? I'm not sure what I'm saying now is is different from what what you what you summarized. So if the court's happy with what I've already said, I'm happy to stop there. You know, it's late Friday afternoon. I always hate to turn down an offer to stop. But if you have more, you want to say, please go ahead and say it. If there are further questions, I'm happy to entertain them. Otherwise, I think I've made my point. Well, you could reserve the rest of your time for rebuttal in case you need to. You need to come back to it. Thank you. All right. On the appellee's side. Am I correct that Mr. Westerfield wanted to go first and then the state second? Yes, your honor. That's correct. OK. You may proceed. OK. Before we leave. Does anybody have questions, specific questions for Mr. Cardozo? I do not. But I know he's on the line and ready to respond to questions. No. OK. Then, Mr. Westerfield, you may go ahead. Good afternoon, your honors. My name is Alex Westerfield. I represent Plaintiff's Immigrant Legal Resource Center and Freedom for Immigrants. Division of Labor on our side will be roughly the same as it was on the other. I will be addressing standing success on the merits and balance of equities issues. And Gabrielle Boutin with the state will be addressing intergovernmental immunity. So as to the first point, your honors, standing plaintiffs clearly meet the standard for standing in this case. Their organizations will be disrupted if the challenge facilities are to open. Is this court held earlier this year? I don't understand. I don't understand how it's disrupted. It just gets an opportunity to do more of what it's been doing. You don't even say you're short of money to do more of what you've been doing. I imagine there may be foundations that are happy to give you as much as you want to do what you've been doing or maybe not. But the record doesn't say one way or the other. In what way? It seems to me that you'd be disrupted if you had to turn from your mission to something else. That's what one of the formulations addresses. But in this case, I don't understand where you're diverted from doing just what you always do, which is to represent these detainees. So a couple of points on that, your honor. First of all, in the standing declarations filed before this court in connection with the motion to stay, which was the first time standing was ever actually properly raised, ILRC alleges that the effects of the facilities would essentially overwhelm their organizations as currently constituted. That overwhelming would impact their ability to meet the needs coming in and that overwhelm. That's like a Black Friday sale at the at the department store. It just means a lot of customers. No, your honor. It's more like, I guess, if we're using analogies, sort of like a overwhelming of an electrical grid where some things just don't get done. Not too many people in one place at one time trying to do one thing, but too much demand. What can't get done? What can't get done? That's a significant point. And I want to know what can't get done. So as to plaintiff freedom for immigrants, your honor, this organization operates a number of certain programs. Among them are the detention visitation program and the detention facility hotline. So if these facilities were to open, FFI would necessarily need to expand those programs into the new detention facilities. That expansion would take time and would take energy that it could otherwise direct elsewhere. The organization has other priorities such as community organizing, legislative and regulatory advocacy, and public relations concerning immigration detention issues and immigration issues more generally. Mr. Westerfield, can I ask you two questions about the standing point? One is we're at a preliminary injunction stage. What do we have to conclude about standing at this point that you might be able to show it, that you have conclusively shown it? What's what's our job at this stage? So, your honor, the answer to that question is that it doesn't matter because this isn't a close case on standing. But if it did matter, indulge me, if it did matter, what would you have to show? I would say that it would be a likelihood of success on the merits. So I would like to have success on the merits of showing standing. Yes, your honor. I would just say that the probabilistic standard of a preliminary injunction filters down into the article three considerations. And that's OK. I just wanted to know. I'm not sure the answer. Let me ask you the second question. It comes from my initial exchange with Mr. Kirk. Assuming there's no standing. Are you thereafter precluded from raising any claims in state court relating to the state statute? And I take it is the government then precluded in state court from arguing the state statutes unconstitutional. So we're just left with a we have to wait for somebody with standing before we can address any of these issues. So, your honor, if the question goes to the interaction between Section 1442 and Article three. Sure. Nobody doubts that they have for the moment. Nobody does that. They are really removed. At least nobody's contesting that on in this case. We certainly don't contest that. This is from the federal officer statute allowed them to remove. Now, let's assume that your your clients don't have Article three standing. Let's just assume we find those two things. OK, what do we what do we do? So on the assumption that those things are true, which obviously we we don't accept. You know, on the assumption that nobody thinks you're conceding anything. Just on the assumption that those two things are true under Section 1447. See, this court has to remand the case to state court. Although Gio presented the opposite conclusion as well settled. The fact is that no court has ever reached the conclusion that it is here. The Supreme Court has held an international primate that this is an open question. The main case on which it relies was decided, I believe, two years before the Supreme Court explicitly held that this was an open question. This court in Lee has recognized in 2001 that it remains an open question. And as far as I'm aware, there's nothing suggesting that a case can be removed pursuant to the federal officer removal statute and then dismissed because of the lack of Article three standing. That would be, I believe, inconsistent with the Supreme Court's Article three jurisprudence, which holds over and over, typically in the context of a plaintiff, because typically the well-pleaded complaint rule applies, which it does not hear that the party invoking federal jurisdiction. There's the burden of establishing jurisdiction. Can I go to a real quick. What's the limits on your standing theory? It seems like under your theory, you have standing any time the government apprehends any additional alien. It's possible that we have standing your honor, but that's not necessarily relevant because not every time the plaintiff organization is injured for purposes of Article three. That doesn't mean it can bring a lawsuit. There would have to be. But you agree that under your theory, every time the government apprehends one additional alien, you have standing to bring a suit if you wanted to. I don't agree with that, your honor. And that's because there are things other than the increase in aggregate detention capacity about this case that gives plaintiff standing. So it's not only the increase in detention capacity, which I'm aware is a disputed fact in this case, but the opening of two new facilities of themselves that create. But you were saying any time you have to surge a resource to a new detainee, then you have standing. So each additional alien that the government apprehends will give you standing. Is that right? Your honor. So this, I think, gets to the business as usual argument that appears in defendants papers. I think this would be it would be useful to focus on what the business as usual cases they're actually saying. So if there is a minor increase in workload under this court's holding an American diabetes, that's not enough to confer standing. We're talking about something completely different here, as alleged in the declarations. Require roughly a year of an FFI staff member's time in order to inaugurate and promote the detainee visitation program and the hotline program in the two new detention facilities. The sort of equation of one additional detainee with the burden of two new detention facilities just isn't analogous. Can I ask you to switch gears for a moment? And because you've got limited time and tell me why you think the procedures here violated the statute. It seems to me the most reasonable reading of this statute is it imposes an aggregate. At least on the number of meetings, an aggregate requirement on the city before the city can grant the permit, it has to have two public meetings. And the way you get there is by saying, well, the city must have to and each public agency must have to. And why is that the most reasonable reading of the statute? So we think that's the most reasonable reading of the statute because California law, as a default matter, distinguishes between municipalities and their subordinate entities, such as commissions. On that point, you can look at provisions of the California government code cited in our brief, which basically say there are these separate entities, cities and their commissions. But for purposes of this statute, we're going to treat them as one. Well, but I also find statutes that actually use the word city and its commissions or city and its departments and city and its subdivisions. And this statute doesn't do that. And it seems to me the most natural way to read it is to see it as describing four separate categories, a city, a city and county, etc., a county, a public agency. Why isn't that the I mean, just as a matter of plain English, why is that the most natural way to read it? Oh, we don't believe that's the most natural way to read it because we don't believe the planning commission is the city for purposes of SB 29. Our argument is not the planning commission could never count as the city for any purpose. However, even if the court decides that the planning commission does count as the city, that doesn't necessarily mean that the two meeting rule did not also apply to city council. And this goes to the facts of this case, which is that city council's review of the geofacilities was completely independent, completely separate from the rule from the hearings at the planning commission. City council considered separate evidence. It took separate testimony. It considered under the council municipal code. It's an appeal to the city council. It uses the word appeal. Your honor, that's correct. But it doesn't function anything like the appeal from the district court does. For instance, there's no constraints on what the city council can review. The meeting minutes. How does that alter the nature of its of its review? It's as you said, it's not a district court appealing to an appellate court. So the record could be completely open to both entities. Yes, the record is. This is exactly our point. Your honor, the review is completely independent. So the city is, in effect, acting again. It is acting separately. It is acting again for the first time. So the two meeting rule should act again and separately for the first time. Now, even if the two meeting rule doesn't apply, the 180 day rule unambiguously does. And here, city council approved the permits about 100 days, I believe, 104 days. So tell me why on that point. Tell me why on that point you equate approval with execution. Again, again, I'm not pretending to be Brian Garner, but it does seem to me that the ordinary understanding of those terms would be different. So we equate approval with execution because in the context of a public participation statute, this provision has to be interpreted to maximize public participation and can't be interpreted to be completely duplicative of other statutes already in effect. I don't know. I don't know why it has to be interpreted to maximize. It should be interpreted to say what it says. It says two. It doesn't say at least two. It doesn't say more than two. It just says two. And I just don't understand what you said a moment ago about the separate entities. I'm thinking if I applied your logic to this court, when we have a three judge panel and then a case goes on bonk, you would treat the on bonk as though or a different court entirely, kind of like district court and circuit court. Neither. Neither makes sense to me. I must be missing something in your argument. So we're talking now about the 180 day requirement in your honor, which we believe. Yeah, I don't see why we should interpret it expansively so that it means 180 days each time. Partly, I don't understand your notion that it should be interpreted expansively as opposed to just meeting what it says. And partly, I don't understand your argument, as I've just indicated, for the same reasons that Judge Hurwitz has raised. The planning department isn't a separate thing. It's just part of the city bureaucracy. So even setting aside the two meeting rule and even setting aside the separate application of the two meeting rule and the 180 day provision to the city council and to the planning commission, city council approved the geo facilities less than 180 days after the planning commission's notice. So even what is the approval? What does that matter? Since the approval was just tentative, nothing happens when they approve it until the execution day and they could change their mind. Your Honor, it's not true that the permits are not final. There is no mechanism in city law for the city to change its mind, although perhaps it's a theoretical possibility. It's not one contemplated by city statute to the extent that appellants are arguing that, you know, citizens could sit outside city council until it changes. I suppose that's true, but that's not a mean they couldn't open this. They couldn't open the detention centers until the decision was executed as opposed to when the approval was granted. Isn't that true? Yes, Your Honor, although the difference between execution and approval here is somewhat artificial in the sense that if the city could approve the facilities five days after first giving public notice, which is what other provisions of state law would require, this statute would be essentially meaningless. It would basically impose no substantive effect. No, that's not true. That's not true. What the statute requires on its face is that however the city acts, it can't allow the expansion of the facility until 180 days have passed from the initial notice to give everybody plenty of time to do whatever it's going to do during that time period. So even under any interpretation, there's a strong purpose to the statute. It means 180 days is going to pass from the time they notice this application until something happens. So there's plenty of time to run your public hearings. There's plenty of time for you to run to court and do things.  So we disagree here, Your Honor, because this is a public participation statute, and the opportunity for public participation ends once the permits have been approved. There is no public participation at the phase of execution. There is no public participation between approval and execution. And there's just no opportunity for public participation, which is what this statute is about. Let me ask you one more question while I know your time's up. The district court, when it looked at irreparable harm, looked at potential irreparable harm to detainees, COVID, et cetera. But you're not suing as a representative of detainees. As you just argued, your argument is based on your organizational standing. Didn't the district court err in looking at the harm to detainees in considering the irreparable harm prong of the winter test? Your Honor, to the extent that there was an error, that error was harmless in that it does not affect the substantive rights of the parties. The public interest so overwhelmingly overwhelms the balance of equities in this case for all the reasons that are stated in our brief, in which I don't need to refer to. That seems to me problematic. I mean, on the one hand, you have the government, which has the authority to actually decide what the public interest is, saying the public interest is to protect these detainees from the COVID-19 virus by spreading them out more. And on the other hand, your organization, which is not elected or appointed by the government or anything, says the public interest is to keep them in the same facilities and not to spread them out more. You disagree. I don't see why it's overwhelming or clear or anything like that, that you're right as opposed to the government being right on what the public interest is. I mean, the government's position would imply that in order to advance organizational goals, you're proposing to make a whole lot of detainees sick by keeping them cooped up close together. So you can keep killing people if you do that. One quick point on that, Your Honor, if the government or appellants wanted to argue that opening facilities would have would ease the spread of COVID, they could have gotten someone with epidemiological training. That's what they said. I thought that's what they said. I thought they said that was the whole point of it. We already have this six foot distancing idea that the federal health authorities have propounded, and that necessarily involves spreading people out. Your Honor, that's what an attorney said in litigation. However, other branches of the federal government, such as the CDC, have said that detainees transfer should be restricted to the extent possible. The state of California temporarily banned them in light of the pandemic. And if the government wanted to put on testimony or declarations from someone with medical or epidemiological training, they could have done so. I imagine if you hadn't gone for a T.R.O. and a pro X party so that they weren't behind the eight ball throughout the litigation and the judge actually got to hear both sides fully, they might well have. There was really no opportunity for him to do that. Your Honor, that's not correct. The government, not the government, but appellants had time to respond to the T.R.O. order, which was also in order to show cause why a preliminary injunction should not issue. That preliminary... I thought you applied X party and that the order was issued while the day before they would reply. That was a T.R.O., Your Honor. There was then a P.I. issued roughly one month later after briefing from both parties. So that P.I., we request that this court affirm it given the overwhelming dangers inherent to opening and operating new detention facilities right now. Incidentally, how come you did delay the application for a T.R.O. until so late since the whole process was visible on the statutes from the get go? So, Your Honor, first of all, as this court's emergency rules in effect in June recognized, there were just quite a lot of administrative delays with almost everything involving the pandemic. This court was willing to extend briefing schedules just on the request of parties by several weeks. We filed on in state court as soon as we were able. We served the complaint as soon as state court got it back to us. There are significant delays associated with state court complaints right now because of the pandemic that we've got to do in my declaration in connection with our T.R.O. filing. And then we filed our request for a T.R.O. in state court as soon as the state judge's calendar allowed, which was that Friday. Thank you, Mr. Westerfield. Thank you, Your Honor. Let's hear from the state. Can I ask you a preliminary question? Does the state intend to argue the state law issues or only the constitutionality of the statute? The state will only be arguing the constitutionality of the statute. So, like Mr. Tenney, you take no position on the other issues in the case? That's right, Your Honor. Okay, good. Then I won't ask you any questions about them. So, the state has addressed both prongs of the intergovernmental immunity analysis in its brief. So, unless the court has any questions about the direct regulation prong, I'd like to focus today on the discrimination prong. So, the U.S. used the word apply to the federal government frequently in their argument. And I think it is important to use the technical words here because SB 29, it regulates local governments. It has effects on private party contractors. And then it has another layer of indirect effects on the federal government. So, that's just an important technical distinction about what the law actually does and who regulates here. Another important distinction is the fact that the law does not draw a distinction between federal immigration contracts. Hold on, counsel. Let me back you up to what you just said. I want some expansion on it. I look at the statute and I can't see where anything non-federal is affected by it. What it says is that a city, county, city and county or local law enforcement agency may not or shall not enter into a contract with the federal government or any federal agency or private corporation to house or detain in a locked detention facility non-citizens for purposes of civil immigration study. I can't think of any kind of circumstance where non-citizens are housed or detained for purposes of civil immigration custody except federal government activities with regard to detention of non-citizens. So, it looks like it's just discriminatory on its face because it only prohibits what the federal government and its contractors may do to implement the federal policy. It doesn't affect anything or anyone else. So, your honor, I'm sorry. I'm not sure exactly which provision you're reading from right now. I can tell you. I'm referring to 1670.9A. Okay. So, an important qualification in A is that it only applies to local governments that as of January 1st, 2018, I should say, that does not as of that date have a contract already with a private contractor or the federal government. So, what SB 29 essentially did is local governments that had intergovernmental service agreements with the federal government and then subcontracted out to private contractors. It kind of froze in place the capacity that these local governments as a whole, the capacity of the immigration detainees that they would be detained. So, Subdivision A says that if you're not already in these types of contracts, you can't enter them. And Subdivision B says if you are already in this type of contract, you just can't increase the capacity of those detention facilities. So, on its face, it applies both to contractors of federal government as well as private companies that contracted with these local governments, these local governments who then in turn contracted them. Since it's all for non-citizen detention, how does it affect everybody else the same as it affects the federal government? What it does is limit the ability of the federal government to create detention facilities in counties that don't already have them or cities that don't already have them and limit them in cities and counties that do. And it's all about non-citizen detention facilities, which only the federal government would be doing, has authority to do. Well, I think there are two parts to the answer. And one is that the local governments did receive reimbursement from the federal government, and that's why they did enter into those subcontracts. But I think also importantly, the legal standard to apply here is whether there is anyone who is similarly situated to immigration detention contractors that is treated more favorably. And as we laid out in our briefing, that is not the case here. There is no one who is better situated. Well, I don't understand that. And that's the question I was trying to ask various other people. Let's assume that I'm running a private detention facility, and I understand in California most of them are illegal, but I'm running a private detention facility for a county. Do I have to go through this process, two hearings before the city, no execution of my expansion permission for 180 days? So, yeah, there are levels to the hypothetical, given what's legal and what's not at this point. I would say, and I assume you mean under the hypothetical. See, I take it what you've done is eliminate the class of those people who might be serving people other than the federal government by saying you can't operate a detention facility in California as a private contractor. So that class of people doesn't exist, right? The problem is that we're talking about a couple of different laws here, I think, at this point, and that's why it gets a little bit complicated. So first, let me just ask a question in stages. Is there anyone in California who operates, other than a governmental entity, who operates a detention facility other than people who are operating those facilities in order to detain immigration people? So are you referring to private prisons? Yeah, are there private prisons in California? There are currently private prisons under AB 32. Operating a private prison is prohibited. However, there are certain exceptions here would be to someone pursuant to a contract entered into before the beginning of this year. Okay, so as to that grandfathered group, if they want to expand the number of people that they have in their prison, must they comply with the requirements of this statute? They would not, but I think the reason that that doesn't matter here is because private prisons are not necessarily similarly situated to federal immigration detention facilities. On their face, they're different facilities. They serve different purposes, and I think another important point is... So then if you're right, you have a statute that only applies to federal immigration facilities, because by your definition, there's nobody else that falls within the statutory coverage. If that's true, why isn't the government right? Well, there are a couple reasons, because one, again, under SB 29, there would be local government contractors that would be treated the same. But there are local government contractors operating immigration facilities because the federal government has asked them to. Just the way private contractors are operating these facilities under contract with the federal government. So it seems to me that's not any different. They're facilities operated in order to aid the federal government in housing detainees. Sometimes they contract with the city. Sometimes they contract with a private party. You haven't applied this to the cities, I take it, right? I haven't applied... Does the statute apply to the cities that are operating these facilities? Well, so, and this is what I was trying to get to. So what's happened is voluntarily, the local governments who were in the business of this have gone out. But on its face, and that's just kind of incidentally what happened after the passage of SB 29, but on its face, they would be treated the same. So this only applies, whether it's a city or a private entity, to people who have arrangements with the federal government to house detainees. Is that a fair statement? I think that's a fair statement, and may I address why that's okay? Sure. So the reason why that's okay is because the standard is not... There is not a standard of, does this isolate a federal activity? That's not the legal standard for discrimination. And first of all, as an initial note, this is not necessarily something that is only a federal activity. There also is conduct involved of the local governments themselves. So it's the state, the most direct regulation that's a part of this is regulation of local governments. So you can't say that this is purely federal activity that's being regulated. The next part is that under the precedent of Washington versus the United States, in that case, for example, there is a statute that only applied to federal contractors. It's distinguished them by name, and yet that was not, that you still went into the similarly situated analysis. You didn't say, oh, just because that statute specifically applies to the federal government only, therefore it violates intergovernmental immunity. And the third reason why it's okay, in addition to the fact that there isn't the federal case law support to say that federal activity per se can be a subject of discrimination automatically, is that kind of the background of all of this is that intergovernmental immunity is not the only doctrine that could be applicable in these situations when it comes to the intersection of state and federal law. There's also preemption. So when we're talking about regulation of something that affects the federal government, that's what obstacle preemption is for, is to say, okay, is this posing an obstacle to federal government purposes? And if so, let's see if Congress has shown an intent, in some cases a clear manifest intent is required to stop this conduct. So we're not operating in a vacuum in which intergovernmental immunity is the only doctrine that could apply to these circumstances, and therefore anything touching on federal activity must violate it. I wonder whether under your argument, if California passed a law that no federal income taxes may be imposed on a Californian, that would not discriminate against the government, because there aren't any other federal income tax collectors except the federal income tax collectors, so there isn't any group to compare to for purposes of deciding whether there's discrimination among entities similarly situated. I think under your argument, California could prohibit the federal government from charging, collecting income taxes in California. The reason that California cannot do that is because that would clearly be directly regulating the federal government, which is the other prong of the intergovernmental immunity analysis, where you can't directly regulate the federal government or its instrumentalities. Your argument is that that wouldn't violate the discrimination prong of the analysis, but it would probably violate 18 other provisions of the Constitution. But they could rephrase it and just say no Californian shall pay federal income taxes to the federal government. Then it would be more analogous to this law. I'd have to think about that a little bit, but I certainly think in that case, obstacle preemption, again, would be the very easy claim to bring, because that would pose an obstacle to the federal government. In North Dakota, the Supreme Court even talks about how basically intergovernmental immunity only has limited application, and in general, it should be left to Congress to determine this balance between federal and state sovereignty. And that would be the preemption analysis. Thank you. Thank you, State. By my calculations, Mr. Kirk has about a minute and Mr. Tenney has a few minutes. And the question is, Mr. Kirk, you're first. Do you want to use it? Yes, Your Honor. I'd just like to make a couple of very brief points. Number one, the straight answer to your question is no other entity except federal immigration facilities are subject to SB 29. The plain text says that. And while it's true that there aren't any currently private entities because of changes on the ground, there were private entities. And I would direct Your Honor to excerpt of Record 864, in which there is testimony that these very entities, Golden State and Central Valley, up until the end of last year, the beginning of this year, were operated as California state prisons under contract to California, and SB 29 did not apply to any permit changes. So it's plainly discriminatory. Last point I wanted to make, Your Honor, was on the CDC point that Plaintiffs' Council made. The CDC specifically accepted out situations where the transfer was made to alleviate overcrowding. So the CDC didn't make that point. And I thank Your Honor for making that point. Thank you. Mr. Tenney. If the court has more questions, I'm happy to entertain them. Otherwise, I don't have anything further. Let me see if my colleagues do. Recognizing that it's almost 8 o'clock on the East Coast, we thank all counsel for their endurance today and their good arguments, and this case will be submitted. The court will be adjourned. Thank you, Your Honor.
judges: Kleinfeld, Hurwitz, Bumatay